# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v().

        **MEMORANDUM OPINION AND ORDER**
Criminal No. 11-200(3) ADM/FLN
Civil No. 15-1789 ADM

George Leslie Wintz, Jr.,

        Defendant.

___

David M. Genrich, Esq., United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

Jon M. Hopeman, Esq., Felhaber Larson, Minneapolis, MN, and James A. Rubenstein, Esq., Moss & Barnett, Minneapolis, MN, on behalf Defendant.

___

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Defendant George Leslie Wintz, Jr.'s ("Wintz") 28 U.S.C. § 2255 Motion [Criminal Docket No. 370].[1] Wintz, currently serving a 42 month prison sentence imposed by this Court on September 20, 2012, argues that a decision by the Eighth Circuit in December 2014 that reduced the sentence of co-defendant John Markert ("Markert") constitutes a newly discovered fact entitling Wintz to a reduced sentence. Wintz's Motion is denied.

## II. BACKGROUND

On December 20, 2011, the Government filed a second superseding indictment against Wintz, who was a customer of Pinehurst Bank, and Markert, the bank's president, for their alleged involvement in a check kiting scheme and a nominee loan scheme. See Second

___

[1] All docket citations are to the Criminal Docket.

Superseding Indictment [Docket No. 118].  The check kiting scheme involved nearly $1.9 million in 15 dishonored checks that Wintz had drawn on a business account with Northstar Bank and deposited into a business account at Pinehurst Bank.[2]  United States v. Markert, 732 F.3d 920, 924 (8th Cir. 2013) ("Markert I").  Upon discovering that Wintz had been kiting checks between the two accounts, Northstar Bank returned the dishonored checks to Pinehurst Bank on March 5, 2009 due to insufficient funds.  Id.  In the days that followed, Markert and Wintz devised a nominee loan scheme to cover the $1.9 million overdraft on Wintz's business account at Pinehurst Bank.  Id. at 924–25.  On March 9, 2009, Markert and members of the bank's Officer Loan Committee prepared and closed five nominee loans, and the proceeds from the loans were applied to Wintz's overdrawn business account.  Id. at 925.  Following discussions with Markert on March 9, 2009, Pinehurst Bank's CFO did not post the checks returned by Northstar Bank until March 10, and thus no overdraft was recorded on the account. Id.

Markert did not inform Pinehurst Bank's Board of Directors about Wintz's near overdraft or his check kiting activities.  Id.  In January 2010, the true purpose of the five nominee loans was discovered during a routine audit, and Markert was immediately terminated.  Id.  Due to the increased loss exposure caused by the loans, Bank regulators required Pinehurst Bank to book an

---

[2] Check kiting is a fraud scheme that utilizes the time, or "float," needed for one bank to collect on checks drawn on accounts at other banks.  United States v. Markert, 732 F.3d 920, 924 n.1 (8th Cir. 2013).  "By transferring funds between accounts at different banks using checks not supported by sufficient funds, the kiter fraudulently inflates the account balances, enabling him to write checks to third parties that the unsuspecting banks pay until the scheme is exposed."  Id.

additional $2.2 million of reserves, which rendered the bank insolvent. Id. Regulators closed Pinehurst Bank three months later. Id.

The Indictment charged Wintz with two counts of bank fraud (one count for check kiting and one count for the nominee loan scheme), five counts of aiding and abetting misapplication of bank funds based on the nominee loan scheme, and one count of embezzlement from an employee benefit plan. See Second Superseding Indictment. Markert was charged with one count of bank fraud (for the nominee loan scheme) and five counts of misapplication of bank funds. The jury convicted Wintz on both bank fraud charges and the embezzlement charge, but acquitted him of aiding and abetting misapplication of bank funds. See Jury Verdict [Docket No. 237]. The jury convicted Markert on all five counts of misapplication of bank funds but found him not guilty of the bank fraud nominee loan count. Id.

On September 20, 2012, Wintz was sentenced to a term of 42 months. Sentencing J. [Docket No. 296]. At the sentencing hearing, the parties disputed the loss amount for sentencing purposes. The Court determined that the amount of loss caused by Wintz's bank fraud violations was $1.88 million, which was based on "the amount involved in the check kiting." Wintz Sentencing Tr. [Docket No. 341] 4:11-14. The loss amount triggered a 16-point enhancement under § 2B1.1(b)(1)(I) of the sentencing guidelines, resulting in a total offense level of 27, for which the advisory guidelines suggested an imprisonment range of 70 to 87 months. Although Wintz was given the benefit of a significant downward departure from the recommended sentencing range, the Court nevertheless found it necessary to impose a sentence that accounted for "a scheme that went on for a long period of time and was not a single act of bad judgment." Id. 16:7–9. The sentence reflected the concern that this was not Wintz's first encounter with

criminal check kiting, as Wintz's solely-owned company O.K. Freightways was convicted of bank fraud in 1999 based on a check kiting scheme. Id. 15:21–16:5.

Wintz avers that after the sentencing, he met with his attorney to discuss his options and was advised by his attorney not to appeal the jury verdict or sentence. Pet. [Docket No. 370] Ex. A ("Wintz Decl.") ¶ 10. According to Wintz, his attorney specifically told him there was "not sufficient legal support to challenge the sentence or loss amount used at sentencing," and that "an appeal would cost approximately $50,000 in legal fees." Id. ¶ 11. Relying on this advice, Wintz did not appeal his sentence. Id. ¶ 12.

On September 21, 2012, the Court sentenced Markert to 42 months, the same term of incarceration as Wintz. Sentencing J. [Docket No. 301]. In determining the amount of loss caused by Markert's misapplication of funds violation, a loss figure that was nearly identical to Wintz's bank fraud violation—$1.8 million—was applied. However, a different analysis was used to determine the amount of loss caused by the misapplication offense. Instead of basing the loss amount on the amount involved in the check kiting, as was done for Wintz, the Court based the loss amount for Markert's misapplication of bank funds on "[t]he amount of funds misapplied . . . and here those nominee loans totaled $1.8 million." Markert Sentencing Tr. [Docket No. 329] 9:11–13. This amount resulted in a 16-point enhancement to Markert's sentence under § 2B1.1(b)(1)(I) of the sentencing guidelines, bringing Markert's total offense level to 29 and his imprisonment range to 87 to 108 months under the advisory guidelines. The Court imposed a downward variance in arriving at the sentence of 42 months' imprisonment.

Unlike Wintz, Markert directly appealed his conviction and sentence. The Eighth Circuit upheld the conviction but remanded for resentencing to correct the calculation of amount of loss

4

under the sentencing guidelines.  Markert I, 732 F.3d at 932.  In so ruling, the Eighth Circuit stated that the loss calculation utilized in Markert's sentencing "failed to acknowledge that the monetary value of the nominee loans [Pinehurst] Bank received in exchange for the misapplied proceeds, measured at the time the misapplication offense was detected, must be credited against actual loss."  Id.

On resentencing, this Court concluded that the actual loss from Markert's offense, even after crediting him against loss for value received by Pinehurst Bank prior to its detection of the offense, was still approximately $1.8 million.  United States v. Markert, No. 11-200(1), 2103 WL 6823359, at *1–2 (D. Minn. Dec. 26, 2013).  Markert appealed again, and the Eighth Circuit held that the Government had not met its burden of proving the actual loss resulting from Markert's offense, and thus no enhancement under U.S.S.G. § 2B1.1(b)(1) applied.  United States v. Markert, 774 F.3d 922, 926–28 (8th Cir. 2014) ("Markert II").  Markert's total offense level was thus reduced to 13, for which the advisory guidelines recommend an imprisonment range of 12 to 18 months.  Because Markert had already served more than 18 months in prison, he was resentenced to time served and released.  Markert II, 774 F.3d at 928.

Wintz now moves the Court under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.  Wintz contends that the Eighth Circuit's decision in Markert II vacated the loss amount relied upon by this Court when sentencing both Markert and Wintz, and thus the 16-level enhancement used in Wintz's sentence no longer applies.  The Government responds that the Petition is untimely and also fails on the merits.

5

## III.  DISCUSSION

28 U.S.C. § 2255 provides a person in federal custody with a limited opportunity to collaterally attack the constitutionality, jurisdictional basis, or legality of his sentence.  See United States v. Addonizio, 442 U.S. 178, 185 (1979).  Relief is reserved for violations of constitutional rights and for a narrow range of injuries which were outside a direct appeal and which, if untreated, would result in a miscarriage of justice.  See Poor Thunder v. United States, 810 F.2d 817, 821-22 (8th Cir. 1987).

Petitions for relief under 28 U.S.C. § 2255 are subject to a one-year statute of limitations period that runs from the latest of four events:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Wintz's judgment of conviction was entered on September 21, 2012 and was not appealed.  As such, the judgment became final long before the one-year limitation set forth in § 2255(f)(1).  Nevertheless, Wintz argues his Petition is timely under § 2255(f)(4) because the Markert II opinion issued in December 2014 qualifies as a new fact supporting his claim.  Under

6

the plain language of § 2255(f), a petitioner "must show the existence of a new fact, while also demonstrating [he] acted with diligence to discover the new fact." E.J.R.E. v. United States, 453 F.3d 1094, 1097 (8th Cir. 2006).

**A. Existence of New Fact**

Wintz argues that the Eighth Circuit's decision in Markert II articulated a new factual finding, namely that the Government failed to meet its burden of proving a loss amount of $1.8 million, and thus no factual basis existed for the 16-level enhancement that was applied to Markert and Wintz's sentences.

In support, Wintz relies on Johnson v. United States, 544 U.S. 295 (2005). In Johnson, the defendant was convicted of a federal drug crime and received an enhanced sentence as a career offender based on two prior state court convictions. Johnson, 544 U.S. at 299. More than three years after the entry of judgment in the federal case, Johnson attacked one of the state court convictions by filing a habeas petition in state court. Id. at 300. The state court vacated one of the state convictions on which Johnson's career offender status was predicated. Id. at 301. Following vacatur, the defendant filed a § 2255 petition seeking to invalidate his enhanced federal sentence, arguing that the vacated state court conviction qualified as a new "fact" under § 225(f)(4). Id. The Supreme Court agreed that the state court vacatur was a "fact" for purposes of § 2255 because "an order vacating a predicate conviction is spoken of as a fact" and "is subject to proof or disproof like any other factual issue." Id. at 307.

A critical distinction exists between Johnson and this case. In Johnson, the state court decision directly eliminated an operative fact (one of Johnson's prior convictions) that was used to enhance Johnson's own sentence. Here, to the extent, if any, that the Eighth Circuit's decision

7

in Markert II articulated a new fact, the new fact pertained only to Markert's sentence, and not to Wintz's. Markert II held that the Government failed to prove the loss amount resulting from Markert's misapplication of bank funds, and thus the fact that had been used to enhance Markert's sentence (misapplication loss of $1.8 million) was eliminated. Misapplication loss was not a fact used to enhance Wintz's sentence. Rather, the enhancement to Wintz's sentence was based on loss from the check kite scheme. See Wintz Sentencing Tr. 4:11–14 ("I have calculated the loss in this case to be at least $1.88 million, the amount involved in the check kiting, but less than $2.5 million, so I have applied a 16-point enhancement to relate to the loss.").[3] Markert II did not address the loss amount resulting from Wintz's check kiting scheme. Thus, the holding in Markert II as to the loss amount from Markert's misapplication of bank funds did not directly eliminate an operative fact that was used to enhance Wintz's sentence.

Wintz's argument to the contrary fails to recognize that for sentencing purposes, the actual loss amount from Markert's misapplication offense is not necessarily the same as the actual loss amount from Wintz's check kiting scheme. The facts and law relating to loss determination for Markert's willful misapplication convictions, which were predicated on the

---

[3] Wintz argues that this Court "relied upon the Government's unproven loss amount for sentencing purposes in the exact same way for Mr. Markert and Mr. Wintz. A separate factual analysis of the loss amount was not conducted based on the different convictions for bank fraud and misapplication of funds." Pet. 10. This contention is factually wrong; the Court's calculation of Wintz's loss was independent from how the loss from Markert's offense was calculated. Compare Wintz Sentencing Tr. 4:11–14 ("I have calculated the loss in this case to be at least $1.88 million, the amount involved in the check kiting, but less than $2.5 million, so I have applied a 16-point enhancement to relate to the loss.") with Markert Sentencing Tr. 9:11–13 ("The amount of funds misapplied is the amount of the loss in a misapplication case and here those nominee loans totaled $1.8 million."). Thus, although the Court arrived at similar loss amounts ($1.88 million for Wintz and $1.8 million for Markert), different analyses were used to reach the result.

8

nominee loans used to cover Wintz's check kite, differ from the facts and law that apply to loss determination for Wintz's Count 1 bank fraud conviction, based on the check kiting. The determination of misapplication loss in Markert I and Markert II centered on the fact that the proceeds from the nominee loans never actually left the bank. As such, "actual loss was only the difference between the amount loaned and the value of the loan (to the extent not repaid) when the fraud was detected." Markert II, 774 F.3d at 926-27 (quoting Markert I, 732 F.3d at 933). This method for measuring loss—calculating the difference between the amount loaned and the value of the loans when the fraud was detected—does not apply to the completely different set of facts of Wintz's check kiting. Further, it does not lead to a conclusion that the Government failed to prove actual loss from Wintz's offense. Indeed, the nominee loans did not even exist on March 5, 2009, when Wintz's check kiting was detected.[4] Thus, the value of the loans at the time Wintz's fraud was detected would be zero. Moreover, Wintz's efforts to repay the check kite through the nominee loan scheme and through a subsequent loan modification agreement are largely irrelevant to his sentence for check kiting, because those efforts were not made until after the check kite was detected. See Markert I, 732 F.3d at 932, n.5 ("[A] defendant's repayment of funds *after* the discovery of a fraud offense is not relevant to sentencing.") (citing U.S.S.G. § 2B1.1 comment. (n.3(E))) (emphasis in original). Thus, for sentencing purposes, the actual loss amount from Markert's misapplication offense is not necessarily the same as the actual loss amount from Wintz's check kiting scheme.

---

[4] Under the sentencing guidelines, "[t]he time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." U.S.S.G. § 2B1.1 comment. (n.3(E)).

Accordingly, the ruling in Markert II—that the Government failed to prove actual loss of $1.8 million from Markert's misapplication offense—does not alter the factual predicate upon which Wintz's sentence was based.

**B. Diligence**

Even if the Eighth Circuit's ruling in Markert II could somehow be considered to be a new "fact" that supports Wintz's claim for relief under §2255(f)(4), Wintz has not demonstrated that he acted with diligence to discover that fact. A new fact triggers a new one-year statute of limitations period under § 2255(d)(4) only if the petitioner has shown diligence in discovering the fact. Johnson, 544 U.S. at 310. For example, in Johnson, although the Supreme Court held that vacatur of the defendant's state court conviction was a "fact" for purposes of § 2255(d)(4), the Court nevertheless concluded that § 2255(d)(4) was not available to the defendant because he had not acted with reasonable diligence in challenging his state court conviction. Id. at 310–11. The Eighth Circuit has held that a petitioner fails to act with the requisite diligence under § 2255(d)(4) if the petitioner does not contest a district court's sentence by filing a direct appeal. E.J.R.E., 453 F.3d at 1098 (citing Johnson, 544 U.S. at 310).

Unlike Markert, Wintz did not contest this Court's sentence by filing a direct appeal. Wintz avers that he chose not to appeal his sentence after meeting with his lawyer and being advised that he would not win an appeal and that an appeal would cost him significant legal fees. See Wintz Decl. ¶¶ 11-12. However, Wintz does not state that the advice of counsel was ineffective or that his attorney refused to file an appeal on his behalf. Indeed, Wintz tacitly acknowledges in his declaration that the decision of whether to appeal the sentence was ultimately his (Wintz's) to make, and that he chose not to do so. See id. ¶ 12 ("I relied

exclusively on [my attorney's] advice that I would not win when <u>I decided</u> not to appeal my sentence.") (emphasis added). The facts available to Markert when taking his appeal were equally available to Wintz, who, after engaging in a cost-benefit analysis, made a decision not to appeal. Thus, Wintz has failed to established that he exercised the requisite diligence under § 2255(f)(4).

### C. Parity

Even if the motion were timely, the Court would not exercise its discretion to resentence Wintz to reflect equality and parity with Markert. Wintz and Markert were convicted of separate and distinct offenses. Reconfiguring Wintz's sentence is not warranted here due to the unique and prolonged nature of Wintz's offense conduct, as well as Wintz's repeated involvement in fraudulent check kiting schemes.

## IV. CERTIFICATE OF APPEALABILITY

The Court may grant a certificate of appealability only where a defendant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Tiedeman v. Benson</u>, 122 F.3d 518, 523 (8th Cir. 1997). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). The Court finds it unlikely that another court would decide the issues raised in this § 2255 motion differently, or that any of the issues raised in Wintz's Petition would be debatable among reasonable jurists. Therefore, the Court declines to grant a certificate of appealability. However, this denial in no way precludes Wintz from seeking a certificate of appealability from the Court of Appeals under Federal Rule of Appellate Procedure 22. <u>See</u> Fed. R. App. P. 22(b) ("If the

11

district judge has denied the certificate, the applicant may request a circuit judge to issue it."); Rule 11(a) of Rules Governing § 2255 Proceedings ("If the [district] court denies a certificate, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.").

Also, for the reasons stated above, an evidentiary hearing in this matter is not warranted, as the record and the parties' arguments definitively show that Wintz is not entitled to relief under § 2255. 28 U.S.C. § 2255; Engelen v. United States, 68 F.3d 228, 240 (8th Cir. 1995).

## V. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant George Leslie Wintz, Jr.'s 28 U.S.C. § 2255 Motion [Criminal Docket No. 370] is **DENIED**. A certificate of appealability shall not issue.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 4, 2015.